UNITED STATE DISTRICT COURT
WESTERN DISTRICT
NORTHERN DIVISION

MATTHEW SCHULTZ,

      Plaintiff,

V

                             File No. 2:16-cv-
                             Honorable

MICHIGAN TECHNOLOGICAL UNIVERSITY,
RYAN GRAINGER, and in their individual
and official capacities, LES P. COOK,
BONNIE GORMAN, BRIAN CADWELL,
REID DEVOGE, JOHN LEHMAN,
JENNIFER DONOVAN, DANIEL BENNETT,
IAN REPP, ROBERT BISHOP, RHYS EDWARDS,
and GLEN MROZ,

      Defendants.

_____/

Steven L. Pence (P27172)
Pence Law
Co-Counsel for Plaintiff
102 W. Washington St, Suite 217
Marquette, MI 49855
(906) 273-2261

Nicholas Roumel (P37056)
Nacht Law
Co-Counsel for Plaintiff
101 N Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

## <u>COMPLAINT</u>

Plaintiff Matthew Schultz, appears by and through his attorneys, Pence Law, by

Steven L. Pence and, Nacht Law, by Nicholas Roumel, and for his Complaint states as

follows:

### Preliminary Statement

This is an action to correct the wrongful expulsion of Matthew Schultz from

Michigan Technological University.

### Nature of Action and Jurisdiction

1.      This is an action to enforce Federal Constitutional Rights under the First Amendment to the United States Constitution and The Due Process Clause of the 14th Amendment to the Constitution and to resolve a pendent state claim.

2.      The jurisdiction of this court is invoked pursuant to 42 USC §1983 and 28 USC 1331 for deprivation of Plaintiff's rights to freedom of speech and due process under the First and Fourteenth Amendments to the United States Constitution, and because the amount in controversy exceeds $75,000.

3.      The state law claim in this lawsuit is based on violations of common law, and this court has subject matter over this claim pursuant to 28 USC § 1367.

4.      Venue is proper in this District as all parties are residents of the Western District of Michigan, Northern Division.

**Parties**

5.      Matthew Schultz is a resident of the City of Norway, County of Dickinson, State of Michigan.

6.      Michigan Technological University (MTU) is a State of Michigan public university in Houghton County, Michigan, in the Western District of Michigan.

7.      Defendant Les P. Cook is the Vice President of Student Affairs and Advancement at MTU in Houghton, Michigan and is a resident of Houghton County. He is sued in his official and individual capacities.

8.      Bonnie Gorman is the Associate Vice President and Dean of Students at MTU and is a resident of Houghton County. She is sued in her official and individual capacities.

9. Defendant Brian Cadwell is the Deputy Chief of Police for MTU Department of Public Safety and Police Services (DPSPS) and is a resident of the County of Houghton. He is sued in his official and individual capacities.

10. Defendant Reid DeVoge is an officer with the MTU DPSPS and is a resident of the County of Houghton. He is sued in his official and individual capacities.

11. John Lehman is the Associate Vice President for Enrollment and Communications at MTU and is a resident of the County of Houghton. He is sued in his official and individual capacities.

12. Jennifer Donovan is the Director of News and Media Relations at MTU and is a resident of the County of Houghton. She is sued in her official and individual capacities.

13. Daniel Bennett is the Chief of Police for MTU DPSPS and is a resident of the County of Houghton. He is sued in his official and individual capacities.

14. Ian Repp is the Director of Marketing and Communications at MTU and is a resident of the County of Houghton. He is sued in his official and individual capacities.

15. Robert Bishop is the Director of Academic and Community Conduct at MTU and is a resident of the County of Houghton. He is sued in his official and individual capacities.

16. Rhys Edwards is employed as the Coordinator of Academic and Community Conduct at MTU and is a resident of the County of Houghton. He is sued in his official and individual capacities.

17. Glen Mroz is the President of MTU and is a resident of the County of Houghton. He is sued in his official and individual capacities.

18.     Defendant Ryan Grainger is a former student at MTU and is a resident of Houghton County.

## FACTUAL ALLEGATIONS

### Matthew Schultz's Background

19.     The allegations of paragraph 1-18 are incorporated by reference as if fully stated herein.

20.     On November 12, 2015 Matthew Schultz was a third-year student at MTU, majoring in mechanical engineering, who was involved in the Society of Automotive Engineers (SAE) MTU Enterprise Program Formula Race Team for four semesters. Among his activities, with a team of other students, he engineered a Formula race car and competed against more than 100 other University teams.

21.     Matthew was an Honor Roll student and a graduate of Norway High School, where he played high school football, participated in Boys State, Skills USA, was designated an "Outstanding Student" and earned significant awards in automotive technology, including 2nd place in the Ford/AAA Student Auto Skills competition.

22.     Matthew's family is primarily made up of Caucasians; but a number of family members, including one first cousin, are biracial, being African-Americans/Caucasians. Matthew maintains good ongoing relationships with these family members and other persons who are African American. His biracial cousin will attend MTU this fall. Prior to the events described herein, Matthew led the life of a small town young man who was bright enough to succeed at a challenging educational institution and was uniquely blessed by having, for the Upper Peninsula, an unusually racially diverse family.

### Matthew's November 12, 2015 Post on "Yik Yak"

23.     Matthew Schultz, like many students of his generation, was active on a variety of social media platforms, including "Yik Yak."

24.     Yik Yak is an iOS and Android application that lets participants post anonymous posts that can be seen by other subscribers, within a set radius.

25.     On November 12, 2015 Matthew noticed Yik Yak posts that included comments about recent threats on the campus of the University of Missouri and posts about MTU having its own racial issues.

26.     With the intent to point out the ridiculous nature of the threats ("shoot every black person") and the illiterate language used by racists ("gonna"), Matthew posted the following: "Gonna shoot all black people……. A smile tomorrow", meaning he is going to shoot a smile at black people, expressing, in a humorous way, that he is not racist.

27.     Matthew's words were posted at 1:46 p.m. EST and were followed by an emoji" in the form of a "cheesy smiley face" which he often uses, to wit:

*"Gonna shoot all black people……. A smile tomorrow"*

28.     Matthew's original post on Yik Yak was only posted for approximately five minutes when it was removed by another user, as allowed by a Yik Yak function utilizing the flag in the upper right corner of the post.

**Former Student Ryan Grainger Sent the Post to MTU Vice President Les Cook**

29.     On information and belief, Matthew's Yik Yak post was taken down by one Ryan Grainger, a former MTU student.

30.     Before taking down Matthew's post, Grainger captured an image of it by way of a "screen shot."

31.     Grainger then sent or "tweeted" the screen shot of Matthew's post from his own "Twitter" account ("Nunya Bizness@MTUYaks") to the Twitter account of Defendant Les P. Cook ("@LesPCook") at 1:49 p.m. (Exhibit A)

32.     Twitter is another social media platform, which allows messages, photos, videos and links to be sent to Twitter followers, in tweets of up to 140 characters of text.

33.     Grainger's tweet to Cook also included the remarks: "@LesPCook this is what your students think about the Mizzou terror threats" (Exhibit A). (This was a reference to the racial unrest at the University of Missouri that had been recently reported in the media.)

34.     Defendant Grainger, on information and belief, was well known within the MTU Administrative community as a non-credible former student who carries on an active internet war against the University. Mr. Grainger's Twitter account carries both the defiant moniker, "Nunya Bizness," and the MTU logo, with a red "X" defacing it. He also labels himself on Twitter as "student, writer and **agent of confusion**" (Exhibit B, emphasis added).

### Grainger Then Altered Matthew's Post and Sent the Altered Post to MTU

35.     There was no discernible response by MTU officials to Grainger's tweet of Matthew's original Yik Yak post, "Gonna shoot all black people ....... A smile tomorrow. 😬 "

36.     Accordingly, Grainger altered Matthew's post and tried again. At 1:59 p.m. he sent Defendant Cadwell of MTU DPSPS an email with an attachment containing a variation of Matthew's post that simply said: "**Gonna shoot all black people**," removing the phrase "A smile tomorrow" and the emoji. (Exhibit C, e-mail of Grainger).

37.     At 2:16 p.m. Grainger tweeted the same altered post to both Defendant Cook and Michigan Tech's Twitter account with a taunting, antagonizing and challenging introduction: "@LesPCook your students behave like this. Given what #Mizzou went through how will the school respond? @michigantech" (Exhibit D). (The # or "hashtag" in front of Mizzou is used to categorize tweets and help them show more easily in Twitter searches, so that they can potentially reach a wider audience.)

**MTU Reacts Swiftly and Publicly to the Altered Post and
Concealed the Fact that It Was Altered**

38.     MTU DPSPS Defendant DeVoge issued a campus wide alert at 2:54 p.m. about an anonymous social media threat against "members of our African American community", even though MTU had received two very different posts forwarded from Defendant Grainger, at least one of which was not threatening at all and neither of which said anything about MTU. MTU promised to reveal to the campus community "any further relevant information" (Exhibit E).

39.     The "threat," if any, was not what Matthew had posted when he responded, in opposition to the "hate speech" posted by others on Yik Yak. Rather, the "threat" that MTU warned its campus about was the *altered* post maliciously sent by Ryan Grainger to University officials after Nunya Bizness' first tweet to Defendant Cook elicited no response from MTU officials.

40.     Two minutes after the campus alert, at 2:56 p.m., Defendant Cadwell sent Yik Yak an email and attached an Emergency Request **with the altered post** and asked Yik Yak for help in identifying the author of the post (Exhibit F).

41.     At 3:14 p.m. Yik Yak responded to MTU by asking for a complete screenshot of the post, noting that it had been "cropped." (Exhibit G).

Page 7 of 26

42.     At 3:46 p.m., based upon information and belief, Defendant Cadwell sent Yik Yak the full, unaltered post.

43.     At 3:51 p.m., WLUK TV 3, publicized the altered post, having received it, upon information and belief, from Defendant Grainger.

44.     At 4:11 p.m. Yik Yak denied the MTU Emergency Request, believing the full post **did not constitute "an emergency involving danger of death or serious physical injury"** (Exhibit H).

45.     In spite of MTU officials knowing there were two posts, one of which was altered with the intent to make the original post look sinister, MTU failed to investigate Defendant Grainger and his Twitter account to determine if he intended to terrorize MTU students, and/or simply intended to embarrass administration, but only focused on the altered words falsely attributed to Plaintiff.

## MTU Misled Authorities, Matthew Schultz and his Attorney in Seeking a Search Warrant and Arrest Warrant

46.     At 4:41 p.m. Defendant Cadwell enlisted the support of Defendant, Officer DeVoge. In spite of Yik Yak's opinion that there was no threat, DeVoge proceeded to obtain a search warrant directed to Yik Yak's legal department to obtain the address and phone number of the author of the original post. The Affidavit in Support of the Warrant is false, as it omits the fact that two versions were sent by Ryan Grainger to MTU officials via both email and Twitter (Exhibit I, Search Warrant 11/12/15).

47.     Hours later, at 9:32 p.m., Yik Yak responded to the search warrant by producing contact information for Matthew who was arrested by MTU DPSPS, without warrant or probable cause, at 11:55 p.m., on the felony charge of domestic terror (Exhibit J, 5 page police report).

48.     While questioning Matthew, the MTU DPSPS never informed him that his post had been altered, that altered post was the impetus for the campus alert, and that altered post also served as the basis for the initial request to Yik Yak.

49.     The MTU DPSPS report sent to Plaintiff's Attorney, Tony Ruiz, deliberately and maliciously withheld information about Mr. Grainger's involvement in the campus hysteria created by Mr. Grainger and the Administration's knee-jerk response to Mr. Grainger's provocation (Exhibit K, Sworn Statement of Antonio Ruiz).

50.     On or about 8:00 a.m. on November 13, 2015 Matthew's father, Al Schultz, spoke with Bonnie Gorman, Associate Vice President and Dean of Students. Ms. Gorman told Mr. Schultz that "MTU has both of Matthew's posts."

51.     This is false. Matthew did not make two posts.

52.     Although arrested for a felony calling for a 20-year prison sentence, Plaintiff was charged with and arraigned on a 90-day misdemeanor, "disturbing the peace, contrary to law" (Exhibit L, Complaint).

53.     With the Prosecutor being unwilling to issue a warrant on the charge for which Matthew was arrested, MTU DPSPS, belatedly, needed to find evidence of motive and intent and they seized Plaintiff's computer and searched his apartment, pursuant to a search warrant. The Sworn Statement of Defendant Cadwell again omitted the truth about MTU receiving two different versions of the post (Exhibit M, Search Warrant, 11/13/15).

54.     No evidence of any crime was found and, behaving inconsistently, Mr. Schultz's vehicle was never searched by MTU DPSPS and "stick drives" and cell phones were not confiscated from his apartment.

55.     At 4:31 p.m. on November 13, 2015, MTU's Associate VP for Enrollment and Communication, John Lehman, was recorded on ABCTV10 news as reporting the altered "Grainger post", stating "The anonymous poster said they wanted to shoot all black people. We called Public Safety immediately. They sprang into action and we sent a note out to the entire campus informing them of the nature of the threat." (Exhibit N). (http://abc10up.com/university-wrestles-with-racism-on-campus/)  Dr. Lehman's quote is contrary to the police report sent to Matthew's attorney Tony Ruiz.

56.     Plaintiff's name was linked to this hateful statement labeling him as a young white male who had the intent to shoot "all blacks". MTU consistently withheld from the public any mention of "a smile" which was part of Matthew's original post, quoting only the part that stated "Gonna shoot all black people."

### MTU Encouraged the Public to Believe that Matthew's Post Simply Said He Was "Gonna Shoot" or "Kill" "All Black People"

57.     Throughout the coming days, MTU officials continued to fan the flames of racial conflict, always using Matthew as a poster boy for white hatred, to wit:

a.     WLUC TV6 showed the altered post in connection with the arrest of Plaintiff.

b.     Jennifer Donovan, MTU spokesperson told Red Alert Politics, that the threat from Matthew was, "Going to kill all black people" and also, contrary to the police report, falsely stated that MTU had discovered the threat "while monitoring the Yik Yak app feed as usual" (Exhibit O, Release).

c.     The Daily Mining Gazette quoted Ian Repp, MTU Director of Marketing and Communications as saying the "poster" was "gonna shoot all black people" (Exhibit P, article).

d.      Numerous other media outlets, including the Michigan Tech Lode Newspaper, Keweenaw Report, The Ludington Torch, Iron Mountain Daily News, ABC 10 News, WJMN TV Escanaba, The Detroit News, Reuters, Mic News, *inter alia,* quoted the altered version MTU officials told media. Matthew's photo was shown with the altered post numerous times.

58.     While portraying themselves as "good guys" and enlightened Administrators, fighting a demon that did not exist, Matthew was suspended by MTU and threatened with expulsion by the Office of Academic and Community Conduct because he "sent" an unspecified "message" to MTU (Exhibit Q, Letters of Robert M. Bishop and Rhys Edwards).

59.     Plaintiff's name and image continued to be linked by MTU in the media with the threat that he, Matthew Schultz, was "Gonna shoot all black people" even though after his arraignment, the Prosecutor stated there appeared to be "no obvious evidence of motive or intent" (Exhibit R, article).

60.     In lieu of pursuing or exposing Grainger for his false report to MTU officials and campus police, the MTU Defendants instead knowingly perpetuated the myth that Matthew had written the altered post, in order to serve MTU's own political purposes.

61.     For example, by November 15, 2015, MTU officials, including Defendants Cook and Bennett, helped organize both a rally for "racial harmony" and a march that sought to pressure the Prosecutor to issue more serious charges against Matthew while MTU knowingly, and with malice, withheld from everyone the truth of what had happened. President Mroz appeared at one of the protests, holding hands with protestors around the Husky Statue (Exhibit S, articles).

62.     MTU Administration lent its support to an open letter from a black alumnus who made usage of the altered Yik Yak post with Matthew's full name, age and major. With MTU having been embarrassed by a campus Halloween event wherein students appeared in "black face" and a confederate flag was displayed, Matthew would be sacrificed in the name of showing MTU's commitment to fighting racism (Exhibit T).

63.     By November 16, 2015, the Houghton County Prosecutor revealed that there had been "some apparent miscommunication between myself and Michigan Tech" and all charges would likely be dismissed (Exhibit U).

### Defendants Misled and Concealed Information from Plaintiff During his Disciplinary Process

64.     On November 17, 2015, Matthew's Attorney received a copy of the MTU DPSPS police report which omits the fact that there was an altered post sent by Ryan Grainger and says nothing about MTU Administration alerting the police to the Yik Yak post (Exhibit J).

65.     In the narrative of this police report, the full post made by Matthew is noted even though MTU officials **had never used anything but the altered post** of Defendant Grainger in their media releases.

66.     The police report falsely represents that the University only made use of the entire posting of Matthew in order to secure help from Yik Yak in trying to determine the identity of its author.

67.     On February 15, 2016, in response to a FOIA request by a MTU student (Brent Halonen), a version of the police report was produced that was materially different than the one provided to Tony Ruiz, Matthew's attorney (Exhibit V, altered police report).

68.     Just two days before responding to the Halonen FOIA request, MTU finally admitted publicly that two versions of the Yik Yak post existed, releasing statements to Garrett Neese for The Houghton Mining Gazette dated February 13, and the Iron Mountain-Kingsford Daily News dated February 16. (Exh W) In the media, Defendant John Lehman made several false claims, including:

- That the two posts were "no different" in intent, which begs the question as to why MTU did not disclose the actual, unaltered post three months earlier;

- That it was the university's own monitoring of social media that alerted them to this "criminal activity", contrary to both police reports;

- That an "investigation was already underway when the subsequent edited version was published by others and apparently disseminated by others to the public," when it was Lehman and other MTU officials who disclosed and perpetuated this "edited version" to the media.

69.     While it is understandable that a police report might include additional investigative facts and "a supplemental report" might be necessary, what MTU provided in response to Mr. Halonen's FOIA request was a new, fraudulent substitute for the police report that Matthew, his attorney and, on information and belief, the Prosecutor received. To wit:

a.     In the first report, referring only to the original, unaltered post, it is stated that Ryan Grainger informed MTU DPSPS of the Yik Yak post.

b.     In the second report only, it is stated that the DPSPS **simultaneously** received the report from Defendant John Lehman and "Bran Grainger." *(sic)*

Page **13** of **26**

      c.     In the second report only, it is stated that the post allegedly seen on Yik Yak by Grainger was altered.

      d.     In neither report is there any evidence to support a public statement by John Lehman of an investigation begun based on MTU's own monitoring of Yik Yak.

70.    The falsification by MTU of a police report continued a pattern that began with, among other things, President Glen Mroz falsely declaring that Yik Yak was "cooperating" with their investigation. The only "cooperation" provided by Yik Yak was to comply with a valid subpoena, but that was 6.5 hours after the MTU "emergency request" (Exhibit X).

71.    As his disciplinary hearing approached (December 7, 2015), neither Matthew nor his Attorney were privy to the truth of what had taken place, as the deception of MTU was unknown until MTU was forced in February 2016, to respond to the Halonen FOIA request. Further, Attorney Ruiz's request to be present at disciplinary hearings was denied, since they were only "educational in nature" (Exhibit Y, letter of Defendant Edwards). This was contrary to the MTU Student Code of Community Conduct, Article IV (B), p. 14, which permits counsel when there are pending criminal proceedings, as there were here. However, Defendant Edwards told Matthew that Ruiz could not be present, only dismissively telling Matthew that Ruiz "could sit outside the door."

72.    On December 7, 2015, all charges against Matthew were dismissed by the Houghton County Prosecutor because of "communication problems" between him and MTU and because Matthew had threatened no one.

73.     The dismissal of criminal charges had no impact on the MTU Conduct Board, which proceeded with its hearing against Matthew on December 7, 2015, with neither Matthew nor his attorney being present. Matthew instead provided a written refutation of the charges. (Exhibit Z)

74.     The Conduct Board found Matthew responsible for violations of MTU policies concerning "Disruptive Behavior" and "Services" As a consequence, the Board placed him on 18 months' probation with various conditions (Exhibit AA, letter of Defendant Bishop of December 16, 2015).

75.     On December 22, 2015, Matthew appealed the decision, writing in part:

> "I'm appealing the disruptive behavior and services. I see no disturbance as a result of the original post. The disturbance we have witnessed is a result of the edited post seen on live TV, and in numerous news reports before Yik Yak released facts." (Appeal, Exhibit BB)

76.     Shortly after Matthew filed his appeal, and without further hearing, Defendant Gorman, who decided the appeal, **reinstated** the most serious charges against Matthew, and **increased** his penalty from probation to **expulsion - without right to appeal** (Exhibit CC).

77.     The reinstatement of all charges by Defendant Gorman, after Matthew's appeal, was a denial of Plaintiff's due process rights and against written school policy as expressed in the Student Code of Community Conduct, to wit:

> The Dean of Students or designee, or Appellant Board, may (a) deny the appeal; (b) remand the case to the original hearing officer or hearing committee; (c) change (increase or decrease) the sanctions, and/or (d) dismiss the original charges. In cases involving more than one charge, an appeal decision may include more than one of the options in (a) through (d). (Section VII, Appeal Procedures)

78.     In violation of this policy, Gorman chose to increase the sanctions to expulsion. The policy permits her to increase the sanctions, but she did so based on her finding that Matthew was responsible for serious charges that had already been dismissed. Defendant Gorman had no right to reinstate charges, which had already been dismissed, and to do so, was a violation of Matthew's due process rights.

79.     Gorman had been active in fomenting campus anger against Matthew, including the false claim that he had sent two posts to MTU.

80.     Additionally, on information and belief, the MTU Conduct Board and Defendant Gorman were privy to information withheld from Matthew, including the attachments referred to in the first police report, the second police report, nor other material information as revealed by Gorman's statement: "a portion of your post...was posted on @MTU Yaks 30-40 minutes after the initial post" (Exhibit CC).

81.     Because Defendants failed to reveal this material information prior to the hearing, Matthew was not afforded an opportunity to respond, defend or explain his Yik Yak posting and to understand the role played by Ryan Grainger in provoking MTU into ill-advised action.

82.     For example, before he learned of the materially withheld information, Matthew had asked Defendant Edwards on December 1, 2015 why his name was linked to a post he did not author. Defendant Edwards denied all knowledge of two separate posts having been received by MTU even though all news reports only made use of the altered post.

83.     Gorman also relied on materially false information in her decision (Exhibit CC), including:

- Contrary to both police reports, she falsely concluded that the MTU's reaction was based on Matthew's "initial post.;"

- The seven bullet points on which she relied, describing what the University and University community did in response to the post, were generally undertaken because of the false public perception – knowingly perpetuated by MTU defendants - that Matthew had written only the altered post;

- Gorman falsely claimed, in the face of uncontroverted evidence to the contrary, that all of the actions described in those seven bullet points were undertaken "before the second post was discovered."

84.    It was not until February 2016, that Matthew understood the nature of the case and the evidence against him and how it came to be that he was targeted by MTU for the actions of another.

85.    The Freedom of Information Act request from Brent Halonen, the results of which were posted by him on "Reddit", revealed the existence of a police report that was substantially different than the police report furnished Mr. Schultz in the fall of 2015.

86.    Had the existence of this police report been known to Matthew he would have been able to respond, explain and defend the innocence of his remarks and show the Conduct Board that the Administration itself took no action regarding "campus safety" until a posting, which was not his, was sent to them.

87.    In the face of a pending FOIA request, MTU told the press, falsely, that steps had already been underway to investigate Matthew's original post when a second, altered post was received by them.

88.    Documentation provided by Yik Yak proves that no investigation was undertaken by MTU until the altered post was received. It was the altered post that MTU originally provided Yik Yak in order to learn the identity of its author.

89.    This evidence was withheld from Matthew and his attorney, affording them no opportunity to properly prepare for the Conduct Board hearing on December 7, 2015.

90.    Even with this lack of notice, the Conduct Board exonerated Matthew from the most heinous allegations leveled against him. (Exhibit AA).

91.    Defendant Gorman decision to expel Matthew after his appeal was forced by the actions of all other Defendants in this matter; to wit, MTU had to expel Matthew, given the false narrative and hysteria created by each and every Defendant in this matter.

92.    Even after the Prosecutor informed Defendants there was no evidence of intent, the police sought a second search warrant to find such evidence and, for a second time, failed to find any (Exhibit V, page 8).

93.    By this time, MTU had a suspect whose intent to cause disruption was clear and yet MTU failed to pursue charges against Defendant Grainger.

94.    In spite of interviewing Defendant Grainger and having him admit the person who altered the original Yik Yak post did so to make it more threatening, except for threatening Matthew with being "recharged," the investigation by MTU appears to have ended with Plaintiff's expulsion and public shaming (Exhibit V, page 25).

95.    Presently, Matthew remains out of school with no hope of resuming his studies anywhere, having been publicly labeled a virulent racist by a University with a history of botched investigations and an inability to do other than protect the institution and the lives of its administrative careerists, at any cost to students or the truth.

## LEGAL ALLEGATIONS

### Count I

### First Amendment Free Speech Rights—All MTU Defendants

96.     Plaintiff repeats paragraphs 1 through 95 as a fully stated herein.

97.     While Michigan Technological University has a right to protect its campus from threats of violence to individuals or groups of individuals, no conduct or words of Matthew either did cause, or had the potential to cause, or induce violence on the campus of Michigan Technological University.

98.     Matthew's post took place on a largely anonymous social media forum, Yik Yak, that was completely unconnected to the MTU campus community except for the happenstance that he was using his personal iPhone in an MTU campus building, and utilizing an MTU IP address, when he made his post.

99.     The entirety of Matthew's post on Yik Yak on November 12, 2015 was extant on Yik Yak for less than five minutes and his words and the context in which they were written, were intended by Matthew to challenge and deflate any threat of violence posed by the words posted by others on Yik Yak.

100.     Mr. Schultz's words were altered and taken out of context by Defendant Grainger and those words were recklessly and willfully attributed to him by Defendants herein in order to justify limiting his free-speech rights and his right to remain on campus as a student.

101.     The words Mr. Schultz wrote were part of an ongoing Yik Yak discussion ignored by University officials who, before punishing Plaintiff for speech, had a duty to learn and consider the context thereof.

102.   When Mr. Schultz's full Yik Yak remarks were first sent by Defendant Grainger to Les P. Cook, they elicited no response from the University.

103.   Shortly thereafter, altered remarks were provided to Les P. Cook and others, leading to a near hysterical response from the University.

104.   Plaintiff has a right, under the First Amendment to the U.S. Constitution, to freely participate in social media discussions about race relations on campuses and elsewhere throughout the United States, which is a topic of significant public interest.

105.   Plaintiff has a constitutional right to exercise free speech and that right can only be restricted by the government under circumstances where Plaintiff's words have the potential to cause substantial harm to legitimate state needs, in this case, to cause a substantial disruption at Michigan Technological University.

106.   Plaintiff has a further right to be free from punishment or retaliation for exercising those First Amendment rights, under the 14th Amendment to the U.S. Constitution, codified by 42 USC § 1983.

107.   At all times relevant, Plaintiff had a clearly established right to freedom of speech of which a reasonable public official would have known.

108.   However, as demonstrated above, Defendants have punished and retaliated against Plaintiff for having exercised his First Amendment rights, by taking the actions described above, while deliberately misleading the campus community, the public, and the prosecutor about what Plaintiff had actually written on Yik Yak, in order to serve their political and other ulterior purposes.

109.   If the MTU Defendants truly believed that Matthew's original, unaltered post was capable of causing substantial disruption, they would not have needed to conceal it and misrepresent it.

110.   At all times relevant, the individual Defendants named in this suit and the other agents, representatives, and employees of Defendant MTU were acting under color of state law and in concert or conspiring with one another, in a common plan, and as such their actions represented official policy of Defendant MTU, and are attributable to Defendant MTU.

111.   These individual Defendants, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's First Amendment rights, and acted out of vindictiveness, malice and ill will towards Plaintiff, and bias and animus, with intent to punish Plaintiff for and to deter him from exercising those rights.

112.   As a direct and proximate result of Defendants' illegal conduct, Plaintiff has suffered great damages, as described more fully below.

113.   Since the government officials in question clearly violated constitutional rights which a reasonable person should have known about and since their conduct is objectively unreasonable, they are not entitled to immunity.

### Count II

**Violation of 14th Amendment Due Process (42 USC § 1983) – All MTU Defendants**

114.   Plaintiff repeats paragraphs 1 through 113 as a fully stated herein.

115.   As a student at public university, Plaintiff enjoyed a constitutionally protected property interest in continuing this education, and a fundamental right and interest in continuing his education in MTU's undergraduate engineering program

116.   MTU could not expel him without due process of law, process that is particularly strong in the case of a disciplinary matter; see, e.g., *Flaim v. Med. College of Ohio,* 418 F.3d 629 (6th Cir 2005).

117.   Defendants' punishing Plaintiff for statements not attributable to him, their increasing the penalty against Plaintiff for appealing in contravention of their own policy, including their dismissal of Plaintiff from MTU, were actions that were arbitrary and capricious and motivated by bad faith.

118.   Plaintiff was not afforded an unbiased, careful, and deliberate review process during the disciplinary process, because Defendants conflated Plaintiff's post with the inflammatory altered post in assessing the impact on the campus community and determining Plaintiff's punishment.

119.   Nor was Plaintiff afforded an unbiased, careful, and deliberate review process as Defendants misled the campus community, the public and the prosecutor as to what Plaintiff actually said, instead desiring to align and ingratiate themselves with those who they misled for political and other ulterior reasons.

120.   Nor was Plaintiff afforded an unbiased, careful, and deliberate review process, as Defendants concealed material information from Matthew and his attorney, made its decisions based on that withheld information, and refused Matthew's attorney's request to be present in a hearing, in violation of its own policies.

121.   Defendants further made false charges and accusations against Plaintiff, and/or allowed false charges and accusations to fester in the public, which stigmatized him and severely damaged his opportunity for a fair and unbiased appeal process, as well

as crippling his opportunities to obtain future education or employment due to the stigma of the record of his expulsion for making a racial threat.

122. In depriving Plaintiff of his constitutionally protected rights, including his fundamental right to and property interest in continuing his public university education, Defendants' actions abridge his right to due process of law in violation of the Fourteenth Amendment to the United States Constitution.

123. At all times relevant, Plaintiff had a clearly established right to due process of law, of which a reasonable public official would have known.

124. At all times relevant, the individual Defendants named in this suit and the other agents, representatives, and employees of Defendant MTU were acting under color of state law and in concert or conspiring with one another, in a common plan, and as such their actions represented official policy of Defendant MTU, and are attributable to Defendant MTU.

125. These individual Defendants, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's Due Process rights, deprived him of those rights, and acted out of vindictiveness, malice and ill will towards Plaintiff, and bias and animus, with intent to punish Plaintiff for and to deter him from exercising those rights.

126. As a direct and proximate result of Defendants' illegal conduct, Plaintiff has suffered great damages, as described more fully below.

### Count III

### Interference with Contractual or Business Relations—Ryan Grainger

127. The allegations of paragraphs 1-126 are incorporated by reference as if fully stated herein.

128.   Matthew had a contractual or business relationship or expectancy with MTU, such that if he did certain things, MTU would provide him with an economically valuable thing, to wit, a good education.

129.   Defendant Ryan Grainger was aware that Matthew was an MTU student with such a relationship or expectancy.

130.   Grainger intentionally and improperly interfered with this relationship or expectancy, by sending an altered post to MTU officials and daring them to take action against the student who allegedly had made this post.

131.   Grainger knew, or should have known, that malicious and egregious act would induce MTU to take disciplinary or punitive action against the allegedly responsible student.

132.   As he intended, Grainger's conduct was the cause of MTU's initiating criminal and disciplinary expulsion proceedings against Plaintiff.

133.   Grainger's intentional interference has caused Plaintiff considerable damages, and entitles Plaintiff to specific relief, as stated herein and below.

## Damages

134.   As a direct and proximate result of Defendants' actions, Plaintiff suffered damages exceeding $75,000, as follows:

    a.   *Economic Damages* – lost wages, lost value of education, lost educational and lost earning opportunities, attorney fees, incidental and consequential damages.

    b.   *Non-Economic Damages* – harm to reputation, emotional distress, mental anguish and continuing mental anguish, denial of social pleasures and

enjoyment, inconvenience, embarrassment, ridicule, humiliation, mortification, fear, and outrage.

135.   At all times relevant, Plaintiff has made a good faith effort to mitigate his damages.

136.   Defendants disregard for Plaintiff's rights was intentional, outrageous, vindictive, malicious, and warrants the imposition of punitive damages.

## Jury Demand

Plaintiff demands a jury trial.

## Relief Requested

**THEREFORE,** Plaintiff requests this Honorable Court grant him:

    a.   In excess of $75,000 damages against defendants in their individual capacities, as warranted by the law and the proofs, including:

        i.   economic and non-economic damages as described above;

        ii.   the greatest possible combination of non-economic and exemplary damages;

        iii.   punitive or special damages as permitted by law;

    b.   costs and pre- and post- judgment interest as permitted by law;

    c.   attorney fees as permitted by 42 USC 1988 (b) and otherwise under law;

d.   prospective relief, as permitted by law and equity, against Defendant MTU and the individual MTU Defendants in their official capacities, for reinstatement and commensurate relief;

e.   other remedies as are just, appropriate, and permitted by law or equity.

Respectively submitted,

Dated:   9/6/16                      By:   _____
                                              Steven L. Pence (P27172)
                                              Co-Counsel for Plaintiff

Dated:   9/6/16                      By:   Nicholas Roumel by, sep, with permission
                                              Nicholas Roumel (P37056)
                                              Co-Counsel for Plaintiff

## JURY DEMAND

Plaintiff Matthew Schultz by and through his attorneys, Pence Law, by Steven L. Pence, and Nacht Law, by Nicholas Roumel, hereby demands a trial by jury on all claims set forth above.

Respectively submitted,

Dated:   9/6/16                      By:   _____
                                              Steven L. Pence (P27172)
                                              Co-Counsel for Plaintiff

Dated:   9/6/16                      By:   Nicholas Roumel, by sep,
                                              Nicholas Roumel (P37056)
                                              Co-Counsel for Plaintiff

Page **26** of **26**